**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

*[ELECTRONICALLY FILED]*

| | |
|---|---|
| NASHAYLA JONES, et al. | **)** |
| | **) CIVIL ACTION NO.:** |
| | **)** 3:18-cv-265-JRW-RSE |
| v. | **)** |
| | **)** |
| LOUISVILLE/JEFFERSON CO. | **)** |
| METRO GOVERNMENT, et al. | **)** |

***\*\*\*\*\****

**JOINT RESPONSE TO MOTION TO DISMISS BY DEFENDANT SEYMOUR AND
DEFENDANTS, BOEHLEIN, BROWNING, CASSE, COBB, DALE, GRANHOLM,
HOGAN, KING, LEDBETTER, PARKS, PHAN, PRIEL, ROBERTS,
ROUTZAHN, WALKER, WEEDMAN, WELLS, AND ZUMMACH**

Come the Plaintiffs, Nashayla Jones and Nascyauni Jones, by counsel, and

hereby submit their Response to the Joint Motion to Dismiss by the Defendant, John

Seymour, and the Defendants, Jeremy Boehlein, Aaron Browning, Joel Casse, P. Cobb,

Vadim Dale, Mark Granholm, Brandon Hogan, M. King, David Ledbetter, Shannon

Parks, Luke Phan, Christopher Priel, Anthony Roberts, Brent Routzahn, Scott Walker,

Daniel Weedman, Chris Wells, and Daniel Zummach.

### I.      Introduction

The Plaintiffs submit herein their Joint Response to the Motion to Dismiss by

Jeremy Boehlein, Aaron Browning, Joel Casse, P. Cobb, Vadim Dale, Mark Granholm,

Brandon Hogan, M. King, David Ledbetter, Shannon Parks, Luke Phan, Christopher

Priel, Anthony Roberts, Brent Routzahn, Scott Walker, Daniel Weedman, Chris Wells,

and Daniel Zummach, that was filed on December 16, 2019, (DN 59); and  the Motion to

Dismiss by John Seymour, that was filed on January 6, 2020, (DN 65).

## II.      Standard of review

The standard for dismissal under Fed. R. Civ. P. 12(b)(6) requires the moving party to demonstrate that there exists no set of facts under which the Plaintiffs could be entitled to relief.  The standard requires taking all well-pleaded allegations in the Complaint as true, and that all inferences to be drawn from the facts as alleged shall be viewed in the light most favorable to the Plaintiffs.[1]  The threshold for determining whether the allegations rise to the level of "well-pleaded" is given by *Bell v. Twombly*, 550 U.S. 544, 555 (2007):  the allegations do not need to have detailed factual information; however, the Complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level."[2]  In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[3]

## III.      Argument

The Defendants' motion to dismiss should be denied because they used **1)** excessive force in detaining the Plaintiffs, who were unarmed and not resisting; **2)** excessive force in the deployment of two flash-bang grenades inside a house where the occupants were sleeping, including children; **3)** unreasonable force in the destruction of the Plaintiffs' personal property, including the killing of the special needs service dog,

---

[1] *Bishop v. Lucent*, 520 F.3d 516, 519 (6th Cir. 2008); *League of United Latin Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)

[2] *Bell v. Twombly*, 550 U.S. 544, 555 (2007)

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

Cashus, destruction of their furniture, and shattering every window in the house – for all of which they are not entitled to qualified immunity – and **4)** the Plaintiffs have stated plausible claims for the state law torts, for which the Defendants are not entitled to qualified official immunity.

The First and Fourteenth Amendment constitutional claims are directed against the municipal Defendant, Louisville Metro, and the Defendant, Thomas Schardein, not the individual officers named above.  In addition, the Plaintiffs previously stipulated in the Motion for Leave to file the Second Amended Complaint that the individual capacity claims with a one-year statute of limitations, against the newly named Defendants, do not carry over to Nashalya Jones' cause of action as stated in the Second Amended Complaint, by operation of Fed. R. Civ. P. 15. (DN 38, p. 4).

### A.  Holding the non-resisting Plaintiffs at gunpoint was unreasonable

Allegations of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment, which requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[4]

The Sixth Circuit evaluates the "nature and quality of the intrusion" on the plaintiff's right to be free from unreasonable seizures by looking at the following: 1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officers or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight."[5]

---

[4] *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation omitted).
[5] *Vanderhoef v. Dixon*, 938 F.3d 271, 276-77 (6th Cir. 2019) (citing: *Harris v. City of Circleville*, 583 F.3d 356, 365 (6th Cir. 2009)

Police officers acting pursuant to a valid search warrant have the inherent limited authority to use reasonable force to detain occupants in the place to be searched.[6]  Within the context of narcotics-related searches discussed in *Summers*, which "may give rise to sudden violence or frantic efforts to conceal or destroy evidence," the Sixth Circuit has recognized that the detention of occupants effectuated by handcuffs and the display of firearms is reasonable "where the officers have a justifiable fear of personal safety."[7]  However, when an occupant has no criminal record, cooperates throughout the ordeal, poses no immediate threat to the officers, and does not resist arrest or attempt to flee, holding them at gunpoint may be objectively unreasonable.[8] Thus, simply because displaying a firearm may be reasonable in some situations, or even presumed to be reasonable prior to the execution of the warrant, based on the nature of the risks commonly associated with the type of search, the objective reasonableness inquiry still governs the analysis of whether it is reasonable to hold an occupant at gunpoint.  If the officers have no justifiable fear for their personal safety, then the detention at gunpoint constitutes excessive force.

In *Vanderhoef*, 938 F.3d at 277, the Sixth Circuit held that "pointing a firearm at an individual and making a demand of that individual . . . communicates the implicit threat that if the individual does not comply" that the officer will shoot the individual.[9] Also in *Vanderhoef*, 938 F.3d at 280, the Court, citing a case from the First Circuit Court of Appeals, *Mlodzinski v. Lewis*, 648 F.3d 24, 37-38 (1st Cir. 2011), acknowledged that "[a] reasonably competent officer … would not have thought that it was permissible to point an assault rifle at the head of an innocent, non-threatening, and handcuffed fifteen-year-

---

[6] *Michigan v. Summers*, 452 U.S. 692, 705 (1981)
[7] *Marcilis v. Township of Redford*, 693 F.3d 589, 599 (6th Cir. 2012)
[8] See *Vanderhoef*, 938 F.3d at 278 and See also *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)
[9] *Vanderhoef*, 938 F.3d at 277 (citing *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007))

old girl for seven to ten minutes, far beyond the time it took to secure the premises and arrest and remove the only suspect." The *Vanderhoef* Court also cited the Seventh Circuit, in *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009), which held that it was unconstitutional for a defendant to "point[] a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting."[10]

Similar cases finding constitutional violations will involve children, where "the unreasonableness of the gun-pointing is more apparent," because children are less likely to present a credible threat to a police officer.[11] In *Robinson v. Solano County*, 278 F.3d 1007, 1015-16 (9th Cir. 2002), the Ninth Circuit held that pointing a gun at an unarmed suspect who poses no danger constitutes excessive force.[12] In *Holland v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001), the Tenth Circuit held that detaining children at gunpoint after the officers had gained complete control of the situation "was not justified under the circumstances."[13]

In sum, pointing a firearm, an act that communicates an immediate threat of the use of deadly force, at an individual, especially a child, who does not pose a threat to the police, is an excessive force violation of the Fourth Amendment.

The key facts in *Vanderhoef* implicate a traffic stop, during which a plainclothes officer ordered a teenager face-down on the roadside, holding him at gunpoint with a pistol to his head, for a duration of two minutes. The Court determined that the facts established a jury question on excessive force.[14]

---

[10] *Vanderhoef*, 938 F.3d at 280 (citing *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009))

[11] *Id.*

[12] *Vanderhoef*, 938 F.3d at 280 (citing *Robinson v. Solano County*, 278 F.3d 1007, 1015-16 (9th Cir. 2002))

[13] *Vanderhoef*, 938 F.3d at 280 (citing *Holland v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001)

[14] *Vanderhoef*, 938 F.3d at 277-78

In *Binay v. Bettendorf,* 601 F.3d 640, 644-651 (6th Cir. 2010), multiple officers, at least one of whom was armed with a shotgun, detained at gunpoint two plaintiffs, who had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee.  The detention lasted from 15 minutes to up to an hour, and it occurred during the execution of a narcotics search warrant.  The Sixth Circuit determined that the facts in *Binay* established a jury question on excessive force, for which "the officers' wearing of masks during the entry and search … add[ing] to an environment of intimidation and terror," could be relevant to the factfinder.[15]

In *Ramage v. Louisville/Jefferson Cnty. Metro Gov't,* 520 Fed.Appx. 341, 347-48 (2013), the plaintiff testified that her detention at gunpoint, by the Louisville Metro Police Department Special Weapons and Tactics Team[16], consisted of two officers pointing their weapons at her for a comparatively brief duration, specifically a length of time roughly equivalent to "how ever long it [took] for these two people to grab … and slam [her] around... and subdue [her]."[17]  The plaintiff also testified that she did not know where the guns were pointed, because the officers were standing to her back.  The Court determined the force used to detain Ramage was not unreasonable.[18]

Of these three cases, only in *Ramage* did the Court conclude that that the detention was not unreasonable, implying that *de minimis* detentions by one or two defendants while the plaintiff is being placed in handcuffs would ostensibly fail to state a claim of excessive force as a matter of law.  *Binay* and *Vanderhoef,* on the other hand, held that excessive force could be established by 1) the use of a pistol by a single officer

---

[15] *Binay,* 601 F.3d at 651

[16] The same municipal defendant that is named in this lawsuit

[17] *Ramage v. Louisville/Jefferson Cnty. Metro Gov't,* 520 Fed.Appx. 341, 347-48 (2013)

[18] *Id.*

for a brief period of time during a traffic stop; and 2) the display of multiple firearms by multiple officers including at least one armed with a shotgun, during the execution of a narcotics search warrant, which lasted at least 15 minutes.

As to the issue of active resistance, while compliance with the commands of law enforcement prove that a detainee is not resisting arrest or attempting to flee, it does not follow, logically or as a matter of law, that failure to comply is equivalent to the type of active resistance that justifies the use of force.  For instance, this Court has held that the inability to comply with officer commands to kneel down due to a medical condition, a specific kind of involuntary restriction on the individual's range of motion, is not active resistance.[19]

In order to prove the liability of an individual officer, "the plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.[20] And once the plaintiff's detention is deemed unreasonable, if it can be shown that any one individual defendant held the plaintiff at gunpoint "at least during some portion of the raid," then there is sufficient evidence to establish that the individual defendant may be liable for the use of excessive force during the detention.[21]

### 1.  Holding Nashayla Jones at gunpoint was unreasonable

Up to ten defendants – Parks, Casse, Dale, Seymour, Routzahn, Walker, Priel, Phan, Hogan, and Ledbetter (DN 45, ¶¶ 52-53, 63),wearing masks, helmets, and body armor, pointed their laser optic-mounted assault rifles at Mrs. Jones, while the laser beads, which indicated the direction of aim, danced on her head, neck, and face area,

[19] See *Martin v. Coyt*, 2012 U.S. Dist. LEXIS 61997, 35 (W.D. Ky. 2012)
[20] *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)
[21] *Binay,* 601 F.3d at 651

upon their encounter with her, immediately upon the team's forcible entry of her home. (DN 45, ¶¶ 51-53, 63).   A "call for numbers" had been issued that directed multiple Defendants to the bedroom.  (DN 45, ¶¶ 52, 57). Nashayla Jones was asleep and naked, when the team rushed into her bedroom, where the members shouted profanities and inconsistent commands at her.  (DN 45, ¶¶ 53-54).  She promptly got out of the bed and cloaked herself with a sheet.  (DN 45, ¶53).  Each of the masked Defendants pushed, shoved, or leveled their assault rifles at Mrs. Jones. (DN 45, ¶¶ 53, 64).  She attempted to step around shards of glass from the windows that the Defendants had broken, and she was menstruating.  She made it known to the operators that she needed to access her feminine hygiene products, which the Defendants refused.  (DN 45, ¶53).

While she was still being held at gunpoint, Mrs. Jones warned the officers that the special needs service animals were in the house, and she told them that her 20-year old son with Asperger's syndrome was in his bedroom.  (DN 45, ¶¶61-62, 55).  The length of her detention at gunpoint spanned at least from the moment of the Defendants' entry to her bedroom, her attempts to inform the Defendants about the presence of the service animals, the location of her children in the house, the fact that she was menstruating and her desire to tend to that need, and the point in time when the "rake and break" team had climbed into her daughter's bedroom – until she was finally led out of the house into the front yard. (DN 45, ¶¶ 67,70)

The target of the raid, the only occupant of the house with a criminal history, Mr. Haqq, was already physically subdued on his knees with his hands on his head, when the detention of Nashayla Jones had commenced.  (DN 45, ¶¶45-46).  Mr. Haqq's arrest was announced by radio to the Defendants.  The entire SWAT team was aware that Mr. Haqq was under arrest at that point, signifying that each operator had actual knowledge that the only objectively perceived threat to their safety was extinguished.

(DN 45, ¶48).  The Defendant, Luke Phan, shoved the muzzle of his assault rifle into Mrs. Jones' chest.  (DN 45, ¶53).

As a result of the hours of surveillance on the house prior to the raid, the Defendants were aware that two minor children and an adult son with Asperger's syndrome lived in the house.  (DN 45, ¶ 42).  Nevertheless, 21 SWAT operators raided the home in a full-scale military operation while the Plaintiffs were asleep. (DN 45, ¶¶41-42, 53).  The 3-level, leased home is far from "large" in comparison with the secure gated compound that sits on 16 acres[22] with three buildings, where Sharon Ramage lived, contrary to the Defendants' description of the Plaintiffs' house as "large" with no other scale reference except the massive compound to put it in perspective.  (Motion to Dismiss, DN 59, pp. 12-13).

Based on the above facts, it is clear that the Defendants' detention at gunpoint of Nashayla Jones constitutes excessive force for the following reasons, according to *Harris* and the controlling case law: she posed no threat of imminent danger to the officers as she was naked and clearly unarmed; there was no justification to use the threat of deadly force against her;  the target of the raid was already under arrest, and the remaining occupants in the house were known to be children, two with special needs; up to ten masked Defendants pointed assault rifles at her, painting her vital organs with laser beads, for a prolonged and unreasonable amount of time; Phan physically shoved her chest with the muzzle of his rifle; and she was not actively resisting, as she was severely physically limited in her voluntary range of motion, because of the broken shards of glass on the ground and her discomfort and embarrassment due to having her period in from of the all-male SWAT detail.

Because the detention was unreasonable, and the facts pleaded demonstrate that

---

[22] *Ramage,* 520 Fed.Appx. at 343

9

ten Defendants participated in at least some portion of the detention, each Defendant is individually liable for the excessive force violations caused by the unreasonable detention of Nashayla Jones.

### 2. Holding Nascyauni Jones at gunpoint was unreasonable

The "rake and break" team member, the Defendant, Granholm climbed through the 16 year-old girl's bedroom using a ladder after breaking the window, while the two other members, the Defendants, Ledbetter and King, remained outside with a line of sight into the room, through the window.  At the same time, the Defendants, Weedman and Wells, entered her bedroom from the interior hallway.  Each of the Defendants including the two who remained outside, Ledbetter and King, pointed their assault rifles, which were mounted with optics, and painted Nascyauni Jones with the laser beads.  The Defendants yelled inconsistent commands, such as "Shut the f*ck up" and "Where is the dope?" – while the girl cradled the second family pet in her lap, which she did not release due to her fear that the officers would kill the dog.   The Plaintiff was sitting on her knees and clad in a night shirt and underwear.  (DN 45, ¶67).  The Defendants held her at gunpoint in this manner for up to five minutes.  Her mother could hear Nascyauni's screams from downstairs. (DN 45, ¶¶62, 67).

Based on the above facts, it is clear that the Defendants' detention at gunpoint of Nascyauni Jones constitutes excessive force for the following reasons, according to *Harris* and the controlling case law: she posed no threat of imminent danger to the officers as she was surrounded by five armed and masked SWAT operators, and she was unarmed; there was no justification to use the threat of deadly force against her; the target of the raid was already under arrest, and the remaining occupants in the house posed no threat; five masked Defendants pointed assault rifles at her, painting

her vital organs with laser beads, for a prolonged and unreasonable amount of time, up to five minutes; and she was not actively resisting, because she was physically subdued and limited in her range of motion by panic and the fear that the Defendants would kill the dog that she was clutching.

### B. Throwing *two* flash bang grenades in a house where children are sleeping is unreasonable

The deployment of two flash-bang grenades in a house where the occupants and children are known to be sleeping raises the same fact-sensitive inquiry into excessive force that is analyzed under the objective reasonableness standard.[23] Recurring and prevailing factors identified in the decisions of courts in the Sixth Circuit and elsewhere, which affect the right of the occupant in forbearance of the use of flash-bang grenades, include the presence of children in the residence, occupants who are sleeping, the number of grenades deployed, and whether the grenades were detonated inside or outside the residence.

Specifically, in deciding that the Ramage defendants had not used excessive force in deploying one grenade outside the building, the Court noted the officers' decision "not to set off the flash-bang inside the home due to the possibility that children might be inside."[24] Similarly, the Court in *Krause ex rel. Estate of Krause v. Jones,* 765 F.3d 675, 679 (6th Cir. 2014), credited the officers for being mindful of the risk "that the flash bang could harm others, including children, the elderly or others in the wrong place at the wrong time." The facts in *Estate of Bing v. City of Whitehall,*456 F.3d 555, 569 (6th Cir. 2006) included the deployment of two separate flash-bang grenades in which the Court

---

[23] *Moore v. City of Memphis*, 853 F.3d 866, 871 (6th Cir. 2017)
[24] *Ramage,* 520 Fed.Appx. at 343

acknowledged that while the first grenade may be reasonable, a jury could find that the second grenade could constitute excessive force.  Flash bangs are explosive incendiary devices used to distract and shock occupants during a raid, which create a "bright white flash and an extremely loud 'bang' noise[25]."  The District Court in *Ramage* observed that "the use of flashbangs is questioned because it presents a danger to the occupants when deployed inside a building."[26]

Even if the first grenade is a distraction device, the second grenade is simply a grenade, the distraction function being obviated by the first blast.  Assuming without stipulating that the deployment of the first grenade in this case was not unreasonable, the second explosion was unnecessary and constitutes excessive force.  All of the occupants in the house were sleeping when the initial flash-bang was detonated *inside* the house. (DN 45, ¶ 51).  The Defendants knew that at least two minor children and one adult child with Asperger's resided there (DN 45, ¶43).  The Defendants argue in their motion that the use of the flash-bangs was justified because "it appears that officers had not yet encountered any individuals within the home and were still facing a number of unknown factors in a large house."  (DN 59, p. 13).  If an "unknown factor" will include the location or proximity of the occupants to a potential blast hazard, the deployment of a flash-bang grenade is the type of wanton use of force that the case law warns should be heeded in the calculus of reasonableness, by steering the inquiry towards concrete factors (such as the presence of children, sleeping occupants, deployment outside the residence, and use of multiple grenades), and away from a police officer's speculation about "unknown factors."

The Defendants could have detonated one or both of the flash-bangs outside the

---

[25] *Ramage v. Louisville/Jefferson Co. Metro Government*, 2010 U.S. Dist. LEXIS 63688, 14 (W.D. Ky. 2010)
[26] *Id.* at 16

residence, like the officers in *Ramage*, but they did not.  And to the extent that the

purpose of a deafening and blinding explosion device is to create distraction in

furtherance of a law enforcement objective, it is patently unreasonable to throw a

second grenade, whose deployment serves the projection of force, not diversion.  In

sum, the facts of this case favor forbearance in the use of flash-bang grenades, due to the

presence of the children, the fact that the occupants were asleep, the detonation of

multiple devices, and the decision to detonate both of them inside, instead of outside,

the residence.  Therefore, the detonation of the two flash-bangs in the Plaintiffs' home

was unreasonable.

The Defendants who were on the entry team that deployed the first flash-bangs

grenade includes Hogan, Dale, Routzahn, Casse, Priel, and Parks.  (DN 45, ¶¶ 50-51).

The Defendants on the entry team that deployed the second grenade include Weedman,

Browning, Zummach, Cobb, and Wells.  (DN 45, ¶ 54).


### C.  The property destruction during the search was unreasonable

"Excessive or unnecessary destruction of property in the course of a search may

violate the Fourth Amendment, even though the entry itself is lawful and the fruits of

the search are not subject to suppression."[27]

In *United States v. Church*, 823 F.3d 351, 364 (6th Cir. 2016), the Sixth Circuit

observed that the destruction of a personal safe in order to access its contents was

reasonable, pursuant to a valid warrant to search for drugs and contraband.  However,

"a warrant to search for a stolen vehicle would not justify opening a small wall safe in a

bedroom closet, [but] judicial authorization to search a home for contraband drugs,

money associated with drug trafficking, and drug paraphernalia would clearly justify

---

[27] *United States v. Ramirez*, 523 U.S. 65, 71 (1998)

the opening of doors, closets, drawers, safes, and other places where the listed items could be hidden."[28]

When the factfinder is able to determine "that one named defendant 'was part of the entry team' that used excessive force" based on the plaintiff's personal knowledge of the identity of the defendant, "and the other federal defendants worked as a team at all times relevant to this case, a jury could reasonably infer that the other federal defendants also (1) were personally involved in the alleged use of excessive force or (2) failed to intervene to prevent it."[29]

The motion to dismiss makes the argument that a failure to allege that a particular Defendant "took any action in gaining entry" is a failure to state a claim of unreasonable force with respect to that Defendant's entry and occupation of the home. (DN 59, p. 11) and (DN 65, p. 10). However, because the Second Amended Complaint places those Defendants inside the house, the fact of their entry is obviously established, and based on *Fazica*, it becomes a question for the jury whether any Defendant who is part of the entry team can be held individually liable in the use of excessive force. As a result, the Plaintiffs have stated a claim for relief that each member of the entry team engaged in excessive force violations and the unreasonable destruction of property, provided that the underlying excessive force violation is properly alleged.

The Defendant, Parks, broke down an unlocked interior door, damaging it beyond repair, after the team had gained entry to the house. (DN 45, ¶19). Between them, the Defendants broke every single window in the house. (DN 45, ¶¶60, 67, 72-73, and 79). In only one instance was a broken window used to access the interior (DN 45, ¶67). The Defendants broke windows, when they were already inside the house. (DN

---

[28] *Church*, 823 F.3d at 364 (citing *United States v. Lengen*, 245 F. App'x 426, 434 (6th Cir. 2007))

[29] *Fazica v. Jordan*, 926 F.3d 283, 291 (6th Cir. 2019) (quoting *Burley v. Gagacki* ("Burley I"), 729 F.3d 610, 622 (6th Cir. 2013))

45, ¶¶ 67, 79).  They destroyed Nascyauni's mirror, caused irreparable damage to a platinum table, and a birch dresser.  (DN 45, ¶¶ 77-80).  And they ripped a gas oven from the wall, which caused a gas leak that made the house uninhabitable.  Seymour shot and killed Cashus, when the dog posed no imminent threat of harm. (DN 45, ¶¶ 65-66).

The above instances of property damage are gratuitous and excessive, as none them were necessary or reasonably calculated to carry out the objective of a search for drugs or contraband.  The destruction of articles of furniture that have no compartments that could be used to conceal contraband and the breaking of each window in the house are malicious in nature.  The obvious hazard created by ripping a gas oven from the kitchen wall without attempting to repair it or contact a utility company to assess the scene after the fact was unnecessary and unreasonable.

### D.  Killing the service dog, Cashus, was unreasonable

The facts pleaded do not support an inference of a reasonable fear of imminent danger that would justify Seymour's use of force when he killed Cashus.[30]  The officers, including Seymour, were warned that he was a service animal and presented no threat (DN 45, ¶ 61). The dog ran from the chaos toward the children's bedrooms, specifically, to Nascyauni, who was crying out.  Cashus ran away from Seymour and his fellow officers, not towards them, before Seymour shot Cashus in the head.  (DN 45, ¶¶ 62-65).  In the absence of any facts to support a reasonable fear of imminent danger, the Defendants appear to take the extreme and macabre position that a search warrant for a family's home might as well be a death warrant for the family dog.

---

[30] See *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016)

### E.  The Defendants are not entitled to qualified immunity

The Defendants' qualified immunity argument is presented in the section addressing the state common law claims, and it is enjambed with the state qualified official immunity argument.  (DN 59, pp. 16-17) and (DN 65, pp. 11-12).  Out of an abundance of caution, the Plaintiffs will construe the Defendants to have made a section 1983 qualified immunity defense and, thus, respond to it accordingly.

Qualified immunity applies unless "a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[31]

The right to be free from excessive force violations, specifically from being held at gunpoint by the police, in the absence of any risk to officer safety or active resistance is clearly established.[32]

There a several cases in the Sixth Circuit that should have put the Defendants on notice that the Plaintiffs' right to be free from the unreasonable deployment of two flash-bang grenades in their house were clearly established.  After *Bing* in 2006, "[d]efendants were on notice that police use of a flash-bang device could be unreasonable force if detonating such a device substantially increases harm to a suspect."[33]  In *Marmelshtein v. City of Southfield*, 2009 U.S Dist. LEXIS 90402 (E.D. Mich. 2009), rev'd in part, 421 F. App'x 596 (6th Cir. 2011), police who executed a search warrant related to drug possession deployed a flash-bang grenade against the

---

[31] *Ashcroft v. al- Kidd*, 563 U.S. 731, 735 (2011), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)

[32] See *Vanderhoef*, 938 F.3d at 277-80 (internal citations omitted)

[33] *Jones v. Sandusky County*, 2014 U.S. Dist. LEXIS 96627, 10 (N.D. Ohio 2014)

occupants in their home, in violation of clearly established constitutional law.[34]  In

*Ramage*, from 2013, the Sixth Circuit stated that the use of flash-bang grenades that

show "a clear disregard for the safety of the occupants of the home" may be a

constitutional violation.[35]

The Defendants were, thus, on notice that the use of a flash-bang grenade during

the execution of a search warrant, in a home where innocent and unsuspecting children

were present, without first visually checking the interior of the house – specifically, as

the Court in *Ramage* observed, when "police show[] a clear disregard for the safety of

the occupants of the home" – constitutes excessive force under the Fourth Amendment.

The Supreme Court has held that the unreasonable destruction of property may

be an unconstitutional seizure under the Fourth Amendment.[36]  As a consequence, this

right is clearly established.

Thus, each of the excessive force violations alleged in the Second Amended

Complaint implicate the clearly established rights of the Plaintiffs.


### F.  State law claims

The Defendant, Luke Phan, caused a harmful physical contact, without the

consent of the Plaintiff, Nashayla Jones, when he shoved her chest with the muzzle of

his assault rifle.  The facts pleaded and argued above establish that even if a reasonable

---

[34] *Marmelhstein* was reversed on qualified immunity grounds, because the raid in question occurred two years before *Bing* was decided.  The Court reasoned that the defendants could not have been on notice of Bing's holding.  The Defendants in the present lawsuit were clearly on notice, in 2017, that the rights of the Plaintiffs in question were clearly established.

[35] *Ramage,* 520 Fed.Appx. at 346

[36] See *States v. Jacobsen*, 466 U.S. 109, 113 (1984); See also *Soldal v. Cook County*, 506 U.S. 56, 61 (1992); *Thomas v. Cohen*, 304 F.3d 563, 571 (6th Cir. 2002)

basis for the detention existed, he "used more force than was necessary[37],"; therefore, the Plaintiff, Nashayla Jones has stated a claim for battery against Phan.

The Defendants move to dismiss the state law claims of false imprisonment and assault, only with respect to four individual Defendants (Boehnlein, Roberts, Zummach, and Seymour) out of nineteen total individual named defendants.  While the Defendants have chosen not to contest the liability of the remaining Defendants, the Plaintiffs respond that the participation of Boehnlein, Roberts, Zummach, and Seymour in the unreasonable use of force against the Plaintiffs was in excess of the amount of force necessary to detain them.[38]

Defenses to the claims of trespass to chattel and conversion are argued on behalf of only five Defendants (Browning, Boehnlein, Roberts, Zummach, and Seymour). While the Defendants have chosen not to contest the liability of the remaining Defendants, the Plaintiffs respond that the participation of Browning, Boehnlein, Roberts, Zummach, and Seymour in the unreasonable use of force against the Plaintiffs was in excess of the amount of force necessary to conduct their search.[39]

The claim of outrage is directed at the Defendant, Sergeant Schardein, who has filed a separate motion to dismiss not that is not addressed herein.

To the extent that the Defendants' conduct in violation of the Plaintiffs' constitutional rights was not intentional, but reckless, then the Plaintiffs have stated claims of common law gross negligence.

---

[37] *Smith v. Norton Hospital*, 488 S.W. 3d 23, fn 7 (Ky. 2016)
[38] See *Id*.
[39] See *Id*.

The Defendants moving for dismissal of the state law claims are not entitled to qualified immunity, because their extreme and, in some instances, malicious, conduct was the result of bad faith in their attempted execution of their duties.[40]

## IV.    Conclusion

Based on the foregoing, the Plaintiffs respectfully move the Court to deny the Defendants' Motion to Dismiss.

Date: January 27, 2020                        Respectfully submitted,


/s/ Christopher J. Hoerter
Christopher J. Hoerter
Coleman, Roles & Associates, PLLC
1009 South Fourth Street
Louisville, KY 40203-3226
T (502) 584-8583
F (502) 584-1826
cjr.hoerter@gmail.com
*Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

This hereby certifies that the foregoing Joint Response to the Defendants' Motion to Dismiss was filed and served via CM/ECF, on counsel of record, on January 27, 2020.


/s/ Christopher J. Hoerter

---

[40] See *Jacobi v. Holbert* , 553 S.W.3d 246, 253 (Ky. 2018)